**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Anthony James CATALANO,**
**Defendant-Appellant.**

**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Vincent Anthony MOSCATELLO,**
**Defendant-Appellant.**

**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Michael Joseph SWIATEK, Defendant-**
**Appellant.**

**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Frank John CULLOTTA, Defendant-**
**Appellant.**

**Nos. 17714–17717.**

United States Court of Appeals,
Seventh Circuit.

Sept. 23, 1971.

Cummings, Circuit Judge, concurred and filed opinion.

Martin S. Gerber, Robert S. Bailey, Lawrence W. Belson, Ronald P. Alwin, Chicago, Ill., for defendants-appellants.

William J. Bauer, U. S. Atty., Kenneth R. Siegan, Asst. U. S. Atty., Chicago, Ill., for plaintiff-appellee; John Peter Lulinski, Asst. U. S. Atty., of counsel; Lawrence T. Stanner, Chicago, Ill., for the Government at the Trial.

Before KILEY, CUMMINGS and STEVENS, Circuit Judges.

KILEY, Circuit Judge.

Defendants Catalano and Swiatek in Nos. 17714 and 17716, and defendants Moscatello and Cullotta in Nos. 17715 and 17717, respectively, appeal from their convictions by a jury of unlawful possession of TV sets stolen in interstate commerce with knowledge that the sets were stolen.[1] We affirm the convictions.

The four appellants were riding in an automobile about 3 a. m. August 28, 1968. They were stopped by police officers and searched without a warrant, and were taken to a police station. They were released about 5 p. m. with no charge having been made against them.

While the appellants were being detained at the police station, the arresting officers returned to the vicinity where the appellants were stopped and resumed their patrol. About 5 a. m. one of the policemen noticed a yard enclosed with a high fence less than a block from the point of arrest. Being suspicious, he took a point of vantage upon a nearby railroad right-of-way and, using binoculars, saw a parked tractor-trailer with identifying numbers somewhat obscured by paint. Later another policeman with binoculars was able to discern the numbers and reported the observation to a police station at about noon. The num-

---

1. 18 U.S.C. § 659.

bers identified the tractor-trailer as one that had been stolen from a railroad yard some time after 11 p. m. the previous night. The theft had been reported to the police at about 10 a. m.

Police kept the yard and trailer under surveillance. At about 4 p. m. a phone rang in the yard office. At about 4:50 p. m. a black 1957 Pontiac drove up to the entrance and Trznadel[2] and another man emerged and entered the yard. Trznadel placed a white Cadillac so as to block the opening of a gate in the alley at the rear of the yard. The phone rang again and Trznadel ran, entered the office and the ringing stopped. He came out and told the other man he had to leave. Trznadel left in a red Ford parked nearby, and the other man left in the Pontiac.

About 5:15 p. m. the red Ford returned and Trznadel, Catalano and Swiatek, who had shortly before been released from custody, emerged, entered the yard and went to the trailer. Trznadel gave Swiatek a hand bolt cutter, both got on top of a station wagon at the rear of the trailer, and Swiatek cut the bolts locking the rear of the trailer. Swiatek opened the door of the trailer and all three entered and climbed on top of cartons, in the trailer, marked "Zenith Television." They later emerged from the trailer "smiling," left the yard and drove away in the red Ford.

About 8:45 p. m. a car drove to the yard and Cullotta and Moscatello got out. Soon afterward the red Ford returned and Trznadel, Catalano and Swiatek got out. The five entered the yard and went to the rear of the trailer. At about 9 p. m. five policemen forced the yard gate, entered the yard and stationed themselves behind a garage near the trailer. Three others stationed themselves outside in the alley to cut off escape.

A policeman at the garage shouted that they were police and that the five suspects were under arrest. There was no response. He again shouted the message. The response from the rear of the trailer was a volley of gunfire. The police returned the fire and the men dispersed.

Swiatek was wounded outside the yard and arrested; no gun was found on him. Cullotta, Trznadel and Moscatello were arrested at the rear of the trailer, the door of which was open. Catalano surrendered to the police the next day and was arrested. The indictment of the five defendants, the trial, Trznadel's plea of guilty, convictions of the other four, and this appeal followed.

### I.

Before and during the trial, appellants moved to suppress all testimony about their 3 a. m. warrantless "arrest," including the identification of Catalano, Moscatello and Cullotta as Swiatek's passengers in the car at 3 a. m., and all evidence gleaned from surveillance and observation of the action of appellants in or about the yard—on the ground that the arrest was without probable cause and that the evidence gathered was fruit of the "illegal arrest."

The hearing on the motion to suppress adduced the following facts: At 3 a. m. on August 28, 1968, three detectives in plain clothes in an unmarked car saw Swiatek, whom they knew by reputation as a burglar,[3] driving a white Thunderbird in the neighborhood near the yard, an area in which he did not live. As the Thunderbird approached, the detectives noticed other passengers in the car slide down in their seats to hide from view. Being suspicious, they followed the car, stopped it, and ordered the passengers out. The faces of the slouching passengers—Catalano, Moscatello, and Cullotta —were observed by the police officers as they got out of the car. The four appellants were taken to the police station. The investigation of the area and discovery of the trailer followed.

---

2. Trznadel was indicted with appellants, but during trial withdrew his not guilty plea and pled guilty.

3. This fact was not brought out before the jury.

The district court rejected defendants' argument that the evidence should be suppressed on its view that the 3 a. m. incident was not an arrest but a reasonable stop and search based on the justifiable suspicion of the detectives. The court's view also was that even if the stop of the car amounted to an "illegal arrest," there was nothing disclosed as a result of the arrest that could reasonably be said to have led to the evidence later gathered against defendants, since the later patrol of the area and discovery of the trailer would have occurred even if the car had not been stopped.[4] The court further found that the police lacked probable cause for the detention of defendants at police headquarters and suppressed any mention of that incarceration at the trial.

We think the district court's view that the incident was a stop and search police maneuver based on reasonable suspicion and not an illegal arrest was not erroneous. The fact that the suspicion did not amount to probable cause is of no consequence; it is sufficient that "the facts available to the officer at the moment of the seizure * * [would] 'warrant a man of reasonable caution in the belief' that the action taken was appropriate." Terry v. Ohio, 392 U.S. 1, 21–22, 88 S.Ct. 1868, 1880, 20 L. Ed.2d 889 (1968). Here three experienced police detectives observed a known burglar—out of his neighborhood—in the early hours of the morning driving a car containing three passengers, all of whom slouched below the car's windows as it approached the lit-up police car. We think that these facts, taken together,[5] would properly warrant the detectives "to investigate this behavior further," id. at 23, 88 S.Ct. 1868, by stopping the car, restraining the liberty of movement of its occupants briefly, and addressing questions to them. The stop of the car was accordingly legal. It follows that there is no merit in appellants' contention that what police action uncovered thereafter on observation and surveillance is a fruit of a poisoned tree.[6] We need not therefore discuss the district court's further view based on its assumption that the incident was an unlawful arrest.

Henry v. United States, 361 U.S. 98, 80 S.Ct. 168, 4 L.Ed.2d 134 (1959), and United States v. Burhannon, 388 F.2d 961 (7th Cir. 1968), cited by defendants, do not involve the type of police action sanctioned in *Terry*—"necessarily swift action predicated upon the on-the-spot observations of the officer on the beat"[7] —but rather, conduct resulting from the culmination of a prior investigation of the particular defendants, the lawfulness of which is traditionally measured

---

4. Detective Fitzgerald testified that he returned to the scene of the stop for further investigation of the area "because of the suspicious moves" appellants made in slouching below the windows of the car, because of "the vicinity in which they were in," and the police officers' knowledge that Swiatek had a burglary record. On the basis of the evidence and this testimony, the court ruled that the investigation of the area did not result from anything learned by stopping the car.

5. The weight given to these facts, whether taken together or separately, is greater when justification of a stop, instead of an arrest, is involved. For example, the fact that a person was known as a burglar or looked like a burglar "adds little to an affidavit filed with a magistrate in an effort to obtain a warrant.

When the question is whether it was reasonable to take limited but forcible steps in a situation requiring immediate action, however, such a statement looms larger." Sibron v. New York, 392 U.S. 40, 78, 88 S.Ct. 1889, 1910, 20 L.Ed.2d 917 (1968) (Mr. Justice Harlan, concurring).

6. It is not contended that the investigation of the area and discovery of the truck resulted from anything the police learned through detention of defendants at the police station. Appellants' argument merely is that the investigation would not have taken place if Catalano, Moscatello and Cullotta were not identified as being in the car. Consequently, we need not decide if the detention at the police station was itself unlawful.

7. Terry v. Ohio, 392 U.S. 1, 20, 88 S.Ct. 1868, 1879, 20 L.Ed.2d 889 (1968).

by the Warrant Provision of the Fourth Amendment.[8] The recent case of Whiteley v. Warden, 401 U.S. 560, 91 S.Ct. 1031, 28 L.Ed.2d 306 (1970) is inapposite for the same reason.[9] Nor is United States v. Ruffin, 389 F.2d 76 (7th Cir. 1968), in point because the evidence obtained there—the fact that defendants were in possession of a stolen car—resulted from a check on the license plate of the car *following* the illegal arrest of the drivers of the car.

## II.

Catalano contends that the district court erred in denying his motion to suppress evidence as to his activity at the yard at 5:15 p. m. as a fruit of his unlawful "arrest and detention." His argument is premised on the assertion that he would not have been in the yard if he had not gotten a ride from Trznadel when Swiatek and he were released from jail.

In view of our contention that the stop was lawful, Catalano's contention must be limited to his claimed "illegal detention" at the jail.

We think there is no merit to his contention, assuming but not deciding that the incarceration was illegal. The district court was not required to find that but for the detention Catalano would not have been in the yard at 5:15 p. m. The evidence disclosed not only that Catalano was present with the other defendants on all three occasions that they were observed by the police, but also that Catalano climbed into the trailer when he was in the yard with Swiatek and Trznadel at 5:15 and that all three emerged "smiling." This is a question as to the credibility of Catalano's defense that he was a victim of circumstances, and was proper for the jury to determine. The court could well have decided that had it not been for the detention Catalano would have been at the yard earlier. We also note that the jury was instructed that it was not to draw any adverse inference from Catalano's detention at the jail.

Since the evidence as to Catalano's presence in the yard at 5:15 p. m. was properly admitted at trial, there is no merit in Catalano's additional argument that the wrongful admission of this evidence required him to mention that he was detained at the police station.[10]

---

8. In Henry, police officers were investigating a theft of an interstate shipment of whiskey. Acting on a tip of an undisclosed nature that one Pierotti might be involved with "interstate shipments," the police officers followed a car driven by defendants Pierotti and Henry to a residential area and observed defendants place some cartons in their car. The police officers stopped the car, arrested defendants and seized the cartons. The Supreme Court, noting the government's concession that the arrest took place when the car was stopped, held that the arrest was without probable cause. The court went on to add with respect to the conduct observed by the police officers:

> Riding in the car, stopping in an alley, picking up packages—these were all acts that were outwardly innocent. [Defendants'] movements in the car had no mark of fleeing or men acting furtively. *Id.*, 361 U.S. at 103, 80 S.Ct. at 172.

In other words, defendants' conduct in Henry was not such as would warrant a man of reasonable caution to stop them. Moreover, since the evidence used against Henry—the cartons—was obtained through a warrantless search, the search could only be justified as a pat-down for weapons (which it clearly was not) or as incident to a lawful arrest based on probable cause.

In Burhannon, police officers, suspicious that defendant was trafficking in narcotics, conducted a lengthy surveillance of defendant's home and arrested defendant as he entered a taxi, and searched the car "because defendant had 'one hand in his coat'" and "glance[d] around." Again police officers did not have probable cause to make an arrest or reasonable suspicion to stop and search the car. See Sibron v. New York, 392 U.S. 40, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968).

9. In *Whiteley*, the police officers who arrested defendant did not observe him engaged in suspicious activity, but were acting on an arrest warrant, sworn out by a magistrate, which was conveyed to them by a police radio broadcast.

10. We treat as frivolous Swiatek's claim of prejudice from the testimony of Catalano's detention.

### III.

■ The morning after the vital yard events, policemen found a gun in the northeast corner of the yard, and another gun in an adjacent yard. The guns were identified at the trial by the police officers who found them and were offered into evidence. The court reserved ruling on the offers since, at that point, there was nothing to tie the guns to appellants. Evidence was later introduced as to a gunfight at the yard at 9 p. m. when the police officers arrested appellants, and as to the positions of the various appellants during the fight. At the close of its evidence, the government again submitted the guns for admission into evidence. The court rejected the offer, however, on the ground that the gun found in the yard was discovered during a warrantless search conducted the morning following the arrest; and the other gun taken from the adjoining yard was not "connected up" with any of the defendants. Appellants then moved for a mistrial because of the display of the guns before the jury. The court denied the motion but struck all testimony with respect to the guns "as though they never existed."

We see no merit in appellants' contention that a mistrial should have been ordered. First, appellants cannot complain of the initial display of the guns to the jury since no objection was made at that time. Secondly, even if a timely objection was made, we fail to see how the display of the guns to the jury in offering them into evidence prejudiced appellants here in light of the gunfight testimony. Even assuming that it is ordinarily improper to display evidence to the jury which is later ruled inadmissible, see United States v. Heft, 413 F.2d 1027 (7th Cir. 1969), and United States v. Reid, 410 F.2d 1223 (7th Cir. 1969), the display of the guns here merely corroborated the fact that a gunfight took place—a fact which was uncontroverted below[11]—and was not used to link up any appellant to the scene[12] or to show guilty knowledge on the part of an individual appellant. We think the court's cautionary instruction was adequate to protect appellants from any possible prejudice.

This court's opinions in United States v. Heft, *supra*, United States v. Reid, *supra*, and United States v. Kwitek, 433 F.2d 18 (7th Cir. 1970), do not compel a contrary conclusion. In *Heft*, the unlawfully seized gun and stolen money were found in the possession of defendant and were an essential part of the government's proof that Heft committed the aggravated bank robbery. And in *Reid* and *Kwitek* the prejudicial evidence was found in the possession of defendant.

Neither is United States v. Parks, 411 F.2d 1171 (1st Cir. 1969), of aid to appellants. There twenty-two documents were conditionally admitted into evidence at Parks' income tax prosecution and were read and reread to the jury. Later, the trial court struck all twenty-two documents as irrelevant. The court of appeals reversed Parks' conviction and ordered a new trial because of the possibility that such a large quantity of irrelevant material might confuse the jury. We see no applicability of that case to the facts of the case now before us.

### IV.

■ We also see no merit in the claim that the appellants were denied Sixth Amendment rights in the failure of the district court to excuse for cause two jurors who had served on a jury that convicted a former juror of wilful disobedience of a court's instructions. We cannot presume that the experience of these jurors would cause fear of finding appellants not guilty. Rather, we agree with the district court that the experience would impress on the jurors the duty of applying the court's instructions and that close observance of the court's directions would not work to the prejudice of either party.

---

11. Appellant Catalano, the only defendant to take the stand, testified that a gun fight did occur.

12. No identification of the owners of the guns was made.

And we are not persuaded that the district court abused its discretion in denying additional peremptory challenges to remove the two jurors, even though it had granted two additional challenges for two other jurors who had also sat on the earlier contempt case. The court indicated in granting the peremptory challenges that it was merely exercising the discretion delegated to it under Rule 24(b), F.R.Crim.P., to allow additional challenges where there are multiple defendants. It was not required to give additional peremptory challenges. United States v. Hoffa, 367 F.2d 698 (7th Cir. 1966). See United States v. Palumbo, 401 F.2d 270, 275 (2nd Cir. 1962).

## V.

Finally, Cullotta and Moscatello complain that the evidence was insufficient to support the verdict against them. It is true that the evidence against them is not as overwhelming as that against the other appellants. However, the government proved their suspicious conduct and association with the others in the 3 a. m. incident and their arrival at 9 p. m. at the yard where the trailer was parked just before the arrival of the other three, and their accompanying the latter into the yard to the rear of the opened trailer. We think the jury could reasonably infer from this evidence that at that time the five appellants had joint domination and control over the trailer and its contents, so as to justify a finding of possession.

The facts in United States v. O'Brien, 174 F.2d 341 (7th Cir. 1949), distinguish it from the case before us. O'Brien, admittedly drunk, was seen sitting in the passenger seat of a truck one hour before the truck was seen leaving the scene of the theft. And this court's recent opinion in United States v. Nitti, 444 F.2d 1056 (filed June 4, 1971), is also

distinguishable. We said there: "There is not a scintilla of proof that defendant in this case, during the time he was a passenger in the truck * * * saw or had any knowledge of the stolen property carried in the trailer." We cannot say the same of Cullotta and Moscatello. Rather, the case is more akin to United States v. Spatuzza, 331 F.2d 214 (7th Cir. 1964), where the defendant was seen in a garage where boxes containing stolen goods were later found, and was observed directing a van containing another part of the stolen shipment out of the garage.

For the reasons given, the judgments are affirmed.

CUMMINGS, Circuit Judge (concurring).

I agree with the result reached. However, insofar as the Court's opinion distinguishes between the 3 a. m. stoppage of the car on the one hand and the subsequent detention of the appellants at the police station on the other, and then insulates the former from constitutional scrutiny, I am not in agreement. Not only must the officers' actions be justified at their inception, but also they must be "reasonably related in scope to the circumstances which justified the interference in the first place." Terry v. Ohio, 392 U.S. 1, 20, 88 S.Ct. 1868, 1879, 20 L.Ed.2d 889 (1967). The officers' actions here were not akin to the brief intrusion upon personal security inherent in the "stop and frisk" sanctioned in *Terry*. In my view, the hauling of these suspects to the police station without a warrant was an illegal arrest, and that made the entire intrusion unlawful. Cf. Henry v. United States, 361 U.S. 98, 80 S.Ct. 168, 4 L.Ed.2d 134 (1959); United States v. Burhannon, 388 F.2d 961 (7th Cir. 1968). But since the illegal intrusion did not produce any "fruit of a poisoned tree," I concur in the affirmance of the judgments.